James Piotrowski, ISB # 5911
Marty Durand, ISB # 5111
PIOTROWSKI DURAND, PLLC
1020 Main St., Suite 440
P.O. Box 2864
Boise, ID 83701
Telephone: (208) 331-9200
Facsimile: (208) 331-9201
marty@idunionlaw.com
james@idunionlaw.com

Attorneys for Plaintiff

BEFORE THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAT WHITCOMB, | ) |
| Plaintiff, | ) Case No. 2:19-cv-392-BLM |
| v. | ) |
| NORTH IDAHO COLLEGE, | ) PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| Defendant. | ) |

COMES NOW, Plaintiff and hereby proposes that the Court adopt the following findings of fact and conclusions of law.

I.   **Background and Facts of the Case**

1. Pat Whitcomb was a highly successful wrestling coach, leading North Idaho College's men's wrestling team to numerous national championships, national runner ups, and top 10 finishes during his employment from 1997 to 2019. Whitcomb asserts herein that he was fired because in 2016 he began advocating for the rights of a student-athlete he had recruited. This advocacy was not well-received by NIC's administrators and led to nearly three years of ongoing harassment, ultimately ending in Whitcomb's termination.

PLAINTIFF'S TRIAL BRIEF - 1

2. In January of 2016 Whitcomb received an employee evaluation that stated that Whitcomb "exceeds" the expectations of his employer in nearly every category evaluated. (Ex. 1004). This was not unusual. Whitcomb's performance evaluations were uniformly excellent. (Ex. 1001, 1002, 1003). He was praised for winning national championships, for helping his students go on to four year colleges following their tenure at NIC, for his activities to support the local community through charitable activities, and for the fundraising he and his student athletes did for NIC. (Id.). A few months later Whitcomb recruited a student-athlete who was a state champion high school wrestler despite being a double amputee who had lost his legs. The recruitment of such a student should have been a major victory for NIC, which frequently declared its commitment to diversity, and always pressured Whitcomb to recruit wrestlers who could win championships.

3. Immediately upon that student's decision to attend NIC, Whitcomb began requesting that NIC make appropriate accommodations so that this student with disabilities could be a full member of the wrestling team. (Ex. 1005). The accommodations were necessary because the wrestling team practiced on the second floor of a gym that had neither elevators nor ramps. Without appropriate accommodation, the student would be left with the options of ascending the stairs by crawling up them on his hands and stumps (which he did, and which resulted in his suffering infections of his stumps), or being carried up the stairs by his fellow athletes which was demeaning and served only to highlight his differences from his teammates. (Ex. 1029).

4. NIC quickly determined that it could accommodate the student by adding a lift to the space the wrestling team used for workouts and practices. This would have cost a few thousand dollars, the school learned. NIC was not willing to spend that money, and did not approve installation of a lift. Since it would not build a lift, Whitcomb asked that the wrestling team be

PLAINTIFF'S TRIAL BRIEF - 2

moved to a first floor, accessible space, a space which was then unoccupied. This proposed accommodation was also denied. (Ex. 1006).

5. Instead, NIC administrators suggested that the wrestling team hold its practices on the first floor of the gym they were in, which would require the student members of the wrestling team perform daily labor (setting out then putting away wrestling mats) before and after every practice, with the knowledge that the labor was only necessary to accommodate the disability of one of their teammates. Whitcomb had multiple meetings and communications with Student Disability Director Tim Gerlitz, who in turn had multiple communications with various members of NIC administration including Vice President Graydon Stanley abou the matter. However, no other accommodation intended to make it easier for the student with a disability to attend wrestling practice and workouts were ever implemented.

6. From the Spring of 2016, when Whitcomb announced the successful recruitment of a diverse student, until his termination in early 2019, Whitcomb faced a series of adverse employment actions including being placed on a Corrective Action Plan, being subjected to false accusations by his supervisor, and his termination.

7. Athletic Director Al Williams, who had in 2016 praised Whitcomb's work, and who had congratulated Whitcomb on recruiting an outstanding student athlete, by January 30, 2017 placed Whitcomb on a "Corrective Action Plan" which warned Whitcomb he faced possible termination. (Ex. 1011). The Corrective Action Plan now criticized Whitcomb for being too demanding about following the law, and accused him of not being a team player. (Id.).

8. Whitcomb presented NIC with a detailed, written response pointing out the flaws, inconsistencies, and incorrect statements in the Corrective Action notice, but NIC did nothing to prevent Athletic Director Williams from threatening Whitcomb's job. (Ex. 1012). Whitcomb

PLAINTIFF'S TRIAL BRIEF - 3

Case 2:19-cv-00392-BLW   Document 68   Filed 03/24/23   Page 4 of 16

continued to advocate for a better solution throughout the 2016-2017 academic year, and then again in the 2017-2018 school year, exchanging emails and holding meetings with Student Disability Director Gerlitz. In the fall of 2018, Whitcomb again assisted the wrestler, attending meetings with him and the Student Disability Director to continue to seek reasonable accommodations for this student-athlete. No meaningful accommodations were provided with respect to accessing wrestling practice. Members of the wrestling team continued to have to carry their fellow athlete into the wrestling room, or force him to crawl up the stairs on hands and stumps. But Athletic Director Williams continued to attempt to harass Whitcomb and threaten his position as an employee by writing emails to NIC Officers falsely claiming that Whitcomb was misdirecting donated funds to benefit his own program over others. (Ex. 1026).

9. In the Fall of 2018 a student reported to NIC Administration that her boyfriend, who was an NIC wrestler, had received a grade for a 1-hour P.E. class over the summer, but that the student had not attended that class. This second-hand accusation, not directly implicating Coach Whitcomb at all was not handled in the manner that was typical of accusations of employee misconduct. Prior to this time, such accusations were investigated internally, most often by NIC's Human Resources Director, Don Millikan.

10. In this case NIC Officers conducted their own investigation before turning the matter over to lawyers. During the initgial phase of the investigation the student wrestler was interviewed, and he denied having registered for the class, but offered no explanation for how he ended up registered. He did not implicate any of the wrestling coaches in the matter. The P.E. instructor, Amy Moffatt, explained to NIC administration that she did, sometimes, have students who registered for the class but who would not attend. The class was intended to provide regular physical workouts and grades were based simply on doing workouts. Ms. Moffatt explained that

PLAINTIFF'S TRIAL BRIEF - 4

if student athletes took the class, she would give them credit for the workouts that they regularly undertook with their teams. She informed NIC that she did this at the explicit request of NIC's Men's Basketball Coach Corey Symons. And that while she gave the same consideration to wrestlers and other athletes, Coach Symons was the only one who actually asked her to do so. (Ex. 2006).

11. As to the student at the heart of the investigation, a wrestler, Ms. Moffatt stated that she merely "assumed" the student was working out, even though nobody had told her that he had been doing so. She assured NIC that nobody from the wrestling team, specifically including Coach Whitcomb, had asked to pass the student in her summer course, she had merely assumed he was working out and deserved a grade because he was a member of the wrestling team. (Id.).

12. This became a theme of the investigation. Everybody explained to NIC that Whitcomb was not involved. Instructor Moffatt denied having ever talked to Whitcomb about his student athletes taking his course. Assistant Wrestling Coaches told NIC that Whitcomb was never involved in registering students for classes or monitoring their progress because he was unfamiliar with and unable to use the student registration system. The job description for Assistant Coaches clearly and unequivocally showed that advising students on classes was done by Assistant Coaches and not the head coach. (Ex. 1008, 1009). Coach Whitcomb also explained that he did not register students for classes, and did not try to get them credit for classes.

13. NIC decided to hire an insurance defense attorney as an "independent investigator." This was not a regular practice of NIC. Both prior to and after this particular investigation, NIC conducted such inquiries in-house, relying on its HR Department, or utilizing department heads or other relevant personnel.

PLAINTIFF'S TRIAL BRIEF - 5

14. The attorney likewise found no evidence that Whitcomb was involved in registering students for classes, or in getting them undeserved class credits. Assistant Wrestling Coach Keri Stanley expressly denied that Coach Whitcomb had registered students or made any arrangements for them to receive grades or credits from Ms. Moffatt. Assistant Coach Stanley stated it was possible that he had registered the student for a class while the student was at the computer with him, but expressly denied that Coach Whitcomb had done so, and expressly denied that he or anyone else expected a student to get credit for a class they did not attend.

15. Coach Stanley further explained that while he maintained a list of student passwords for the college registrar system, Coach Whitcomb did not. Assistant Wrestling Coach Brandon Richardson likewise denied that he had registered students for classes, denied any knowledge of any type of arrangement with Instructor Moffatt, and did not implicate Coach Whitcomb in any misconduct. Other than the student who first reported the allegation, whose report was based solely on what another student had told her, nobody implicated Coach Whitcomb in any culpable conduct.

16. Instructor Moffat did indicate that Men's Basketball Coach Corey Symons had contacted her regarding basketball players who were to be registered in her class, but who would not attend the class, and as to whom Coach Symons expected Moffatt to provide credit and a grade. Attorney Erbland and Vice President Graydon Stanley attempted to convince the student at the center of this investigation to sign a statement implicating Coach Whitcomb. When the student did not respond, they attempted to convince the student's girlfriend, also a student, to get him to sign the statement he had prepared, and promised him he would not be in any trouble. The student still refused to sign the false statement. . (Ex. 1023, 1024, 1025).

PLAINTIFF'S TRIAL BRIEF - 6

17. The evidence gathered by NIC attorney Erbland thus showed that the basketball coach had an "arrangement" with Instructor Moffatt, but the wrestling coaches had no such arrangement. Further, that evidence showed that Assistant Coach Keri Stanley might have helped to register a student for Moffatt's class, but Whitcomb had no involvement in that process, at all. This was consistent with the job descriptions for Coach and Assistant Coach. (Ex. 1008, 1009). The student involved unequivocally refused to state that Coach Whitcomb was involved in any way whatsoever.

18. The investigation clearly implicated Coach Symons, potentially implicated Coach Stanley, and did not directly implicate Coach Whitcomb in any way. NIC decided to take no action at all against Coach Symons, to terminate Coach Whitcomb, and ultimately allowed Coach Stanley to resign in lieu of termination, but only after offering him the opportunity to protect his job by implicating Coach Whitcomb.

19. The decision making process for Coach Whitcomb varied considerably from the process normally used at NIC. At a meeting called by President Mclennan, the HR Department was informed for the first time of an investigation report. Despite not having reviewed the report, or participated in the investigation, which would have been the norm at NIC, a vote on whether to terminate Whitcomb was taken. Termination decisions were not usually made by popular vote. This process was used solely for Pat Whitcomb. No vote was taken about whether or how to discipline Coach Symons or Coach Stanley.

20. Prior to his termination, Coach Whitcomb earned a salary and benefits, and was also able to operate a wrestling camp for high school athletes which provided additional income. After his termination, he was unemployed for a period, before eventually finding employment that paid less, and offered less in the way of benefits than his position at NIC had provided. He has suffered

PLAINTIFF'S TRIAL BRIEF - 7

damages from lost wages and benefits, and is likely to continue to suffer such losses well into the future.

II.     **Conclusions of Law**

1. North Idaho College is subject to the Rehabilitation Act of 1973. 29 U.S.C. §794. The Rehabilitation Act expressly incorporates 42 U.S.C. §12203, part of the Americans with Disabilities Act, and provides that the standard for claimed violations of the Rehabilitation Act "shall be the standards applied under . . . Sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990." 29 U.S.C. 794(d). Section 503 of the Americans with Disabilities Act expressly prohibits retaliating against any person, including an employee, who opposes an unlawful practice:

> (a) **Retaliation.** No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act.

42 USC §12203(a). The standards for retaliation claims under the ADA are identical to standards for retaliation claims arising under Title VII of the Civil Rights Act. *Brown v. City of Tucson*, 336 F.3d 1181, 1186 (9th Cir. 2003).

2. It is not necessary that a plaintiff alleging retaliation prove that they are a qualified person under the ADA, nor must they prove that the employer was actually engaged in any violation of the Act. The ADA, notwithstanding whether an employee is a qualified individual with a disability, prohibits an employer from taking any adverse employment action against an employee who has engaged in an activity that the ADA protects, or has opposed any activity that the ADA may prohibit. 42 U.S.C. § 12203; *see Pardi v. Kaiser Permanente Hosp., Inc.*, 389 F.3d 840, 849 (9th Cir. 2004).

PLAINTIFF'S TRIAL BRIEF - 8

3. Protected activity may include a request for accommodation if the employee reasonably believed in good faith that he or she was disabled and entitled to the accommodation. *See Coons v. Sec'y of U.S. Dep't of Treasury, 383 F.3d 879, 887 (9th Cir. 2004)*. Furthermore, "an employee's complaints about the treatment of others is considered a protected activity, even if the employee is not a member of the class that he claims suffered from discrimination, and even if the discrimination he complained about was not legally cognizable." *Ray v. Henderson,* 217 F.3d 1234, 1240 n.3 (9th Cir. 2000)(applying identical retaliation standard from Title VII of the Civil Rights Act).

4. The elements of a retaliation claim are well-established, a "*prima facie* case of retaliation requires a plaintiff to show: (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Coons v. Sec'y of U.S. Dept. Treasury,* 383 F.3d 879, 887 (9th Cir. 2004) (citation and internal quotation marks omitted).

5. Plaintiff is not required to prove that his protected activity was the sole reason for his termination, it is sufficient that it be a "motivating factor." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020). In this case, it is enough if Coach Whitcomb would not have been terminated but for his advocacy efforts on behalf of a disabled student.

6. The issuance of a Corrective Action Form and the termination of Pat Whitcomb were both adverse employment actions. Those actions occurred sufficiently close in time to Whitcomb's advocacy efforts to support a claim of causal relation. The Corrective Action Form was issued in the middle of the disabled wrestler's first year at NIC. Whitcomb's advocacy efforts continued into the Fall semester of 2018, which was when the investigation into alleged academic integrity violations occurred, as well as into the following semester when Whitcomb was terminated.

PLAINTIFF'S TRIAL BRIEF - 9

7. The final step in the familiar *McDonnell Douglas* formulation for evaluating employment discrimination claims is a determination of causation. This step has been well-explained.:

> Under the burden-shifting scheme of [*McDonnell-Douglas*], after the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the adverse employment action. *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 919 (9th Cir. 1997); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000); *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1113, 24 Cal. 4th 317, 354 (2000). If the employer rebuts the inference of retaliation, the burden of production shifts back to the plaintiff to show that the defendant's explanation is merely a pretext for impermissible retaliation. *Id*. Pretext may be shown either (1) directly by persuading the [finder of fact] that a discriminatory motive more likely than not motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence. *Godwin v. Hunt Wesson Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). To establish pretext, "very little" direct evidence of discriminatory motive is sufficient, but if circumstantial evidence is offered, such evidence has to be "specific" and "substantial." *Id*. at 1222; *Little v. Windermere Relocation*, *Inc.*, 265 F.3d 903, 915 (9th Cir. 2001).

*Winarto v. Toshiba Am. Elec. Components, Inc.,* 274 F.3d 1276, 1284 (9th Cir. 2001).

8. While proffered indirect evidence of pretext must be "specific" and "substantial," that does not mean it raises the burden or standard of proof. The Ninth Circuit has again explained:

> Where evidence of pretext is circumstantial, rather than direct, the plaintiff must produce "specific" and "substantial" facts to create a triable issue of pretext. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998). *But see Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029-31 (9th Cir. 2006) (questioning the continued viability of *Godwin* after *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003)). That standard is "tempered" by our observation that a plaintiff's burden to raise a triable issue of **pretext** is "hardly an onerous one." *Noyes*, 488 F.3d at 1170 (quoting *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997)).

*Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112-1113 (9th Cir. 2011).

9. "[B]ecause employers know better, direct evidence of employment discrimination is rare." *Aragon v. Republic State Disposal,* 292 F.3d 654, 662 (9th Cir. 2002); *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993. 1008 (9th Cir. 2019). Nonetheless, both direct and idirect evidence supports a finding of causation.

PLAINTIFF'S TRIAL BRIEF - 10

10. The timing of adverse employment actions can provide evidence of causation, and does so in this case. . *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1094 (9th Cir. 2008); *Villiarimo v. Aloha Air,* 281 F.3d 1054, 1065 (9th Cir. 2002);. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000). Whitcomb was subjected to adverse employment actions only after he began advocating for full ADA and Rehabilitation Act compliance.

11. The treatment of similarly situated employees likewise provides evidence of pretext and thus causation:

> A plaintiff may raise a triable issue of pretext through comparative evidence that the employer treated younger but otherwise similarly situated employees more favorably than the plaintiff. *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003); *see also McDonnell Douglas*, 411 U.S. at 804 ("Especially relevant to [a showing of pretext] would be evidence that white employees involved in acts against [the employer] of comparable seriousness . . . were nevertheless retained or rehired."). Here, Earl presented evidence that, during the relevant time frame, Nielsen did not terminate — and in one instance may not have even disciplined — younger "recruiters" in their 30s and 40s when those recruiters repeatedly violated similar Nielsen policies.

*Earl v. Nielsen Media Research, Inc.,* 658 F.3d 1108, 1113 (9th Cir. 2011).

12. The Court in *Earl* further explained:

> Other employees are similarly situated to the plaintiff when they "have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641. The employees need not be identical, but must be similar in material respects. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010). Materiality depends on the context and is a question of fact that "cannot be mechanically resolved." *Id*. at 1157-58. The Seventh Circuit has noted that it is "important not to lose sight of the common-sense aspect" of the similarly situated inquiry. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). "It is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees" because one can always find distinctions in "performance histories or the nature of the alleged transgressions." *Id*.

*Id.* 658 F.3d at 1114-1115. In this case, Corey Symons was similarly situated to Plaintiff Whitcomb. Both were head coaches and thus subject to the same employment and conduct policies, as well as the same expectation. Both Coaches had athletes who took P.E. Classes from

PLAINTIFF'S TRIAL BRIEF - 11

Instructor Moffat. The athletes on both of their teams sometimes received grades despite not attending Ms. Moffat's class. In fact, there is substantial evidence that Coach Syhmons was more culpable than Coach Whitcomb. CDoach Symons had directly contacted Instructor Moffat about his atheltes who did not attend her classes, showing that he clearly expected preferential treatment for basketball players. There was no evidence that Coach Whitcomb had ever made similar requests to Instructor Moffat.

13. Coach Symons and Coach Whitcomb were thus similarly situated, but Coach Symons was not placed on a corrective action plan, and was not terminated from his employment.

14. Assistant Wrestling Coach Stanley and Coach Whitcomb were also similarly situated. They were both employed as coaches. They were both subject to NIC's policies including the academic integrity policy. Coach Stanley, in fact, was much more closely associated with the claimed academic integrity violations. Coach Stanley admitted that he had student athlete usernames and passwords for the class registration system. Coach Stanley understood that he, and not Coach Whitcomb, was responsible for ensuring wrestlers got registered for the classes they needed in order to maintain eligibility.

15. Coach Stanley and Coach Whitcomb were thus similarly situated. But Coach Stanley was informed he could escape termination if he would just implicate Coach Whitcomb, while Coach Whitcomb was terminated without any option to continue his employment.

16. Coach Whitcomb was also subjected to a different discipline and termination process than were Symons and Stanley. Coach Whitcomb's level of discipline was decided by a committee, led by the President, which took a popular vote on whether to terminate. Coaches Stanley and Symons were not subjected to that process. Coach Stanley was subjected to a more typical process in which the involved supervisors (excluding the Athletic Director who was in

PLAINTIFF'S TRIAL BRIEF - 12

the line of supervision for all coaches) consulted with HR and then the NIC officers decided how to proceed. That Whitcomb was treated differently than similarly situated coaches at NIC, both as to process and outcome, is strong evidence that Coach Whitcomb was singled out. Since the primary difference between these coaches was that while Symons and possibly Stanley were more culpable, neither of them had been strong disability rights advocates. The treatment of similarly situated employees in this case is evidence of retaliatory motive.

17. The treatment of Coach Stanley is also direct evidence of pretext. NIC, its President and Vice President all testified that they terminated Whitcomb over the alleged violation of the academic integrity policy. They would have the Court believe that this policy was sufficiently important to justify termination of those involved. But after terminating Whitcomb, President MacLennan and Vice President Stanley were willing to keep Coach Stanley employed so long as he would implicate Coach Whitcomb. This is evidence that the target of the investigation was not academic integrity, but getting rid of Coach Whitcomb.

18. Additional direct evidence of pretext comes from NIC's Human Resources Director, Don Millikan. Director Millikan testified that the investigation process was unlike any previous or subsequent personnel investigation during his tenure at NIC. He further testified that the investigation that was actually performed did not meet either his own standards, or those that he would have imposed as HR Director for NIC. Finally, he testified that in his experience as HR Director at NIC the misconduct alleged would not have supported a termination for any employee other than Pat Whitcomb.

19. There was adequate evidence presented to support each of the elements of a *prima facie* case of retaliation. NIC has presented a claimed non-discriminatory reason for its actions: to wit, the claim of an academic integrity violation. Thus the burden of persuasion and the

PLAINTIFF'S TRIAL BRIEF - 13

burden of proof align and Plaintiff Whitcomb must show by a preponderance of the evidence that he would not have been subjected to adverse employment actions but for his actions in demanding legal compliance.

20. Plaintiff here seeks, and the law provides that he may recover lost wages and benefits he incurs as a result of any wrongful termination of his employment. *Pollard v. E.I. DuPont de Nemours Co.*, 532 U.S. 843, 121 S. Ct. 1946, 150 L. Ed. 2d 62 (2001); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1195 (9th Cir. 2002). His lost wages and benefits are offset by his mitigative earnings. Scott Kimber, a Certified Public Accountant with extensive experience in calculating economic losses and valuations provided testimony about Mr. Whitcomb's losses. Mr. Kimber is qualified to offer expert opinions in the general field of income and compensation calculations. Mr. Kimber's testimony established that Mr. Whitcomb had seen a reduction in compensation for the period from his termination to the date of trial in the amount of $143,953. Mr. Kimber opined that if Whitcomb's employment remains stable, he would predict that Whitcdomb's income from mitigative employment would continue to lag behind the income he would likely have earned as the head wrestling coach at NIC. From the date of trial until normal retirement, Kimber expected that Whitcomb's losses arising from his termination of employment would amount to $271,085 once reduced to present value. The present value of those losses, expressed annually and reduced to present value are as follows:

| Start Date | End Date | | Present Value of Lost Earnings and Benefits |
|---|---|---|---:|
| 03/28/23 | 12/31/23 | | $21,320 |
| 01/01/24 | 12/31/24 | | $27,987 |
| 01/01/25 | 12/31/25 | | $27,996 |
| 01/01/26 | 12/31/26 | | $27,969 |
| 01/01/27 | 12/31/27 | | $27,903 |
| 01/01/28 | 12/31/28 | | $27,797 |
| 01/01/29 | 12/31/29 | | $27,652 |
| 01/01/30 | 12/31/30 | | $27,464 |
| 01/01/31 | 12/31/31 | | $27,232 |
| 01/01/32 | 12/31/32 | | $26,956 |
| 01/01/33 | 01/11/33 | | $808 |

20. The burden of proof in this case is preponderance of the evidence, meaning the facdt finder must be conclude it is more likely true than not true in order to find for Plaintiff. This is not a high burden, but requires merely that the likelihood of truth be greater than 50%, even by only a little.

21. Future losses may only be awarded if reinstatement is not a feasible remedy. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846, 121 S. Ct. 1946, 150 L. Ed. 2d 62 (2001). Since Pat Whitcomb's termination, the NIC wrestling program has gone through at least 2 wrestling coaches. Recently, NIC awarded a head coaching position to a former athlete coached by Mr. Whitcomb. Reinstatement of Mr. Whitcomb would result in termination of that employee. Although the individuals responsible for Mr. Whitcomb's termination no longer work at NIC, the employment relationship between Mr. Whitcomb and the college has been destroyed by both the termination and the lengthy delay in conclusion of this matter (arising from an intervening pandemic). In addition, Mr. Whitcomb has refocused his career on a return to teaching, and reordered his life near Sandpoint, Idaho, a considerable distance from NIC.

PLAINTIFF'S TRIAL BRIEF - 15

Reinstatement would not be a viable remedy and would be likely to do harm to NIC's wrestling program, and thus to its students. Front pay is an appropriate remedy in this case.

### III.     Conclusion

1. Based on the evidence presented, Patrick Whitcomb was retaliated against for insisting upon full legal compliance with the rights of students under the Rehabilitation Act. While this may be a close case, and it appears NIC had several motives for the termination, I find by a preponderance of the evidence that Whitcomb would not have been fired but for his advocacy efforts.

2. As a result of his termination, Mr. Whitcomb has suffered losses up to the date of trial in the amount of $143,953, which he is to be awarded in judgment.

3. As a result of his termination and the deterioration of good will and trust between Whitcomb and NIC, reinstatement is not an appropriate remedy. Instead, Whitcomb should be awarded front pay for the period from conclusion of the trial to normal retirement age, amounting to $271,085.

4. Judgment should be entered for Whitcomb in the total amount of $415,038.

DATED this 24th day of March, 2023.

PIOTROWSKI DURAND, PLLC

   /s/     James M. Piotrowski   
James M. Piotrowski  
Attorneys for Plaintiff
